# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| MICHAEL HAFKEY, Derivatively on Behalf of Nominal Defendant RESOURCE CAPITAL CORP., 2678 S. Rockwell St. Gilbert, AZ 85295 | Case No. |
| | **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY** |

MICHAEL HAFKEY, Derivatively on Behalf
of Nominal Defendant RESOURCE
CAPITAL CORP.,
2678 S. Rockwell St.
Gilbert, AZ 85295
                              Plaintiff,

        v.

EDWARD E. COHEN,
c/o Resource Capital Corp.
712 Fifth Avenue, 12th Floor
New York, NY 10019

JONATHAN Z. COHEN,
c/o Resource Capital Corp.
712 Fifth Avenue, 12th Floor
New York, NY 10019

STEVEN J. KESSLER,
c/o Resource Capital Corp.
712 Fifth Avenue, 12th Floor
New York, NY 10019

WALTER T. BEACH,
c/o Resource Capital Corp.
712 Fifth Avenue, 12th Floor
New York, NY 10019

RICHARD L. FORE,
c/o Resource Capital Corp.
712 Fifth Avenue, 12th Floor
New York, NY 10019

WILLIAM B. HART,
c/o Resource Capital Corp.
712 Fifth Avenue, 12th Floor
New York, NY 10019

GARY ICKOWICZ,
c/o Resource Capital Corp.

Case No.

**VERIFIED SHAREHOLDER
DERIVATIVE COMPLAINT FOR
BREACH OF FIDUCIARY DUTY**

**DEMAND FOR JURY TRIAL**

712 Fifth Avenue, 12th Floor
New York, NY 10019

MURRAY S. LEVIN,
c/o Resource Capital Corp.
712 Fifth Avenue, 12th Floor
New York, NY 10019

P. SHERRILL NEFF,
c/o Resource Capital Corp.
712 Fifth Avenue, 12th Floor
New York, NY 10019

STEPHANIE H. WIGGINS,
c/o Resource Capital Corp.
712 Fifth Avenue, 12th Floor
New York, NY 10019

DAVID J. BRYANT,
c/o Resource Capital Corp.
712 Fifth Avenue, 12th Floor
New York, NY 10019

ELDRON C. BLACKWELL,
c/o Resource Capital Corp.
712 Fifth Avenue, 12th Floor
New York, NY 10019

DAVID E. BLOOM,
c/o Resource Capital Corp.
712 Fifth Avenue, 12th Floor
New York, NY 10019

and

RESOURCE CAPITAL MANAGER, INC.
712 Fifth Avenue, 12th Floor
New York, NY 10019

                    Defendants,



        and

RESOURCE CAPITAL CORP.,
712 Fifth Avenue, 12th Floor
New York, NY 10019

                        Nominal Defendant.

Plaintiff Michael Hafkey, by and through his undersigned attorneys, brings this derivative complaint for the benefit of nominal defendant Resource Capital Corp. ("Resource Capital" or the "Company"), against current and former members of its Board of Directors (the "Board") and executive officers seeking to remedy defendants' breaches of fiduciary duties.

## NATURE AND SUMMARY OF THE ACTION

1.      Resource Capital is a real estate finance company that invests in commercial and residential real estate-related assets and commercial finance assets. The Company's investments include positions in mezzanine loans.

2.      One such position was a $41.1 million ownership interest in a mezzanine loan backed by a portfolio of luxury hotels, including three hotels in Puerto Rico, that Resource Capital purchased in 2007 (the "Mezzanine Loan"). Almost from the time that Resource Capital purchased its position, the Mezzanine Loan's performance was in question. Puerto Rico began suffering from a severe economic crisis in 2007, which affected, among other things, its hospitality industry. In September 2012, the Mezzanine Loan was restructured to stop paying interest. However, between October 2012 and August 2015, the defendants caused the Company's public disclosures to consistently refer to the Mezzanine Loan as "current" or "performing." While disclosing the Company's exposure to loans in various parts of the United States, defendants completely concealed the Mezzanine Loan's exposure to the Puerto Rican economic crisis.

3.      On August 4, 2015, the defendants caused Resource Capital to disclose that the Company had "recognized an impairment of $41.1 million on [the Mezzanine Loan] representing $38.1 million in loan principal and $3.0 million accrued interest reversals, or $(0.29) and $(0.02) per common share, respectively." According to the announcement, the Mezzanine Loan "was

originally supported by a portfolio of 13 hotel properties, most of which were luxury brand hotels. The last three luxury brand hotel properties securing the loan are located in or near San Juan, Puerto Rico, and recent economic and credit disruptions in Puerto Rico resulted in events that caused the Company to determine that the loan should be fully reserved." On this news, the price of Company stock fell significantly.

4.      Due to the drop in Resource Capital's stock price caused by revelation of defendants' deception, a securities class action was filed in the U.S. District Court for the Southern District of New York against the Company and four of the defendants named herein, *Levin v. Resource Capital Corp., et al.*, Case No. 1:15-cv-07081-LLS (S.D.N.Y.) (the "Securities Class Action"). On October 5, 2016, U.S. District Judge Louis L. Stanton denied defendants' motion to dismiss the Securities Class Action and held that the amended complaint filed by the plaintiffs in that case states a claim for securities fraud against all defendants.

5.      Denial of the motion to dismiss the Securities Class Action made it likely that the Company and its insiders would ultimately be held liable for defendants' wrongdoing. On February 10, 2017, plaintiff served a litigation demand on the Board requesting that it investigate and hold accountable the current and former officers and directors responsible for the wrongdoing at issue in the Securities Class Action (the "Demand").

6.      In response to the Demand, and demands received from other shareholders, the Board formed a Demand Evaluation Committee ("DEC") to investigate the claims and present its conclusions to the full Board. In April 2017, after refusing other shareholder demands, the DEC invited plaintiff's counsel to discuss unique issues raised in the Demand. On May 25, 2017, plaintiff's counsel met with the members of the DEC, on June 1, 2017, the DEC recommended

2

that the Board refuse the Demand, and on June 29, 2017, the Board advised plaintiff that it would not pursue the claims.

7.      The Board's response to the Demand did not follow the process required by Maryland law.  It failed to convene an independent committee to respond to the Demand, even though more than half of the directors on the Board were targets of the investigation.  The DEC reached the facially implausible conclusion that, Judge Stanton's denial of the motion to dismiss the Securities Class Action notwithstanding, breach of fiduciary duty claims arising from the misleading disclosures lacked "any" merit.  The Board self-interestedly rubber-stamped that conclusion.  The Board's decision to do so, in the face of law holding that the facts alleged herein state a claim for securities fraud, was not a valid exercise of business judgment.

8.      The DEC's report recommending refusal of the Demand relies exclusively on its conclusory determination that breaches of fiduciary duties could not have occurred because, according to the DEC, Judge Stanton incorrectly applied the law.  Due to this incomplete process, the DEC failed to balance the chances of a recovery and amount of possible funds recoverable against the likelihood of liability in the Securities Class Action and the Board never evaluated whether it would be in the Company's financial interest to pursue the claims.  As a result, plaintiff's Demand was wrongfully refused and plaintiff should be permitted to maintain this action on behalf of Resource Capital and its absent shareholders.

9.      This action seeks to recoup losses Resource Capital has already sustained and will continue to sustain in connection with the wrongdoing alleged herein, the accounting restatement, and all related proceedings.

## JURISDICTION AND VENUE

10. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332 in that plaintiff and defendants are citizens of different states and the amount in controversy exceeds $75,000 exclusive of interest and costs. Plaintiff is a citizen of Arizona and no defendant is a citizen of that state.

11. Venue is proper in this Court because the Company is incorporated in the state of Maryland, a substantial portion of the transactions and wrongs complained of herein occurred in this District, and defendants have received substantial compensation by engaging in activities that had an effect in this district and are directly related to the wrongdoing alleged herein.

**THE PARTIES**

**A.      Plaintiff**

12. Plaintiff has continuously held Resource Capital stock since mid-2014, and is a citizen of Arizona.

**B.      Defendants**

13. Nominal Defendant Resource Capital is an entity incorporated under Maryland law, with principal executive offices in New York, New York. The Company's common stock trades on the New York Stock Exchange under the ticker symbol "RSO."

14. Defendant Edward E. Cohen ("E. Cohen") was a director of Resource Capital from March 2005 until September 2016, and Chairman of the Board from March 2005 to November 2009. E. Cohen has held various positions with affiliates of the Company's external manager and owns approximately 30% of its shares together with his son, defendant Jonathan Z. Cohen ("J. Cohen"). E. Cohen received $5,105,174 in total compensation from Resource Capital in 2012, and $3,018,491 in 2013. Upon information and belief, E. Cohen is a citizen of Florida.

4

15.     Defendant Jonathan Z. Cohen ("J. Cohen") was Resource Capital's President, Chief Executive Officer ("CEO"), and a director from March 2005 until September 2016.   J. Cohen was the Chair of the Company's Investment Committee between April 2012 to April 2016, and held positions with affiliates of the Company's external manager.   Together with his father, J. Cohen owns approximately 30% of Resource America shares.   J. Cohen is a defendant in the Securities Class Action and received $2,750,000 in total compensation from Resource Capital in 2012, $1,249,998 in 2013, $1,999,997 in 2014, and $199,993 in 2015.   Upon information and belief, J. Cohen is a citizen of New York.

16.     Defendant Steven J. Kessler ("Kessler") has been a director of Resource Capital since November 2009.   Kessler served as Chairman of the Board from November 2009 to November 2016, the Company's Senior Vice President from September 2005 to November 2009, and its Chief Financial Officer ("CFO"), Chief Accounting Officer ("CAO"), and Treasurer from March 2005 to September 2005.   Kessler was paid $604,161 in total compensation from Resource Capital in 2012, $368,649 in 2013, $346,399 in 2014, and $347,923 in 2015.   Upon information and belief, Kessler is a citizen of Pennsylvania.

17.     Defendant Walter T. Beach ("Beach") has been a director of Resource Capital since March 2005.   Beach was a member of the Audit Committee and Investment Committee between April 2012 and April 2016.   Beach was paid $124,995 in total compensation from Resource Capital in 2012, $219,999 in 2013, $219,995 in 2014, and $220,001 in 2015. Upon information and belief, Beach is a citizen of New York.

18.     Defendant Richard L. Fore ("Fore") has been a director of Resource Capital from March 2013 until June 1, 2017.   Fore was a member of the Company's Investment Committee between April 2014 and April 2016, and was a member of the DEC.   Fore received $144,301 in

total compensation from Resource Capital in 2013, $199,995 in 2014, and $200,013 in 2015. Upon information and belief, Fore is a citizen of Nevada.

19.     Defendant William B. Hart ("Hart") has been a director of Resource Capital since March 2005.  Hart was a member of the Company's Audit Committee between April 2012 and April 2016.  Hart received $74,995 in total compensation from Resource Capital in 2012, $109,993 in 2013, $109,996 in 2014, and $110,006 in 2015.  Upon information and belief, Hart is a citizen of Virginia.

20.     Defendant Gary Ickowicz ("Ickowicz") has been a director of Resource Capital since February 2007.  Ickowicz is a member of the Company's Investment Committee between April 2012 to April 2016, and a member of the DEC.     Ickowicz received $125,000 in total compensation from Resource Capital in 2012, $199,992 in 2013, $199,996 in 2014, and $199,998 in 2015.  Upon information and belief, Ickowicz is a citizen of New Jersey.

21.     Defendant Murray S. Levin ("Levin") has been a director of Resource Capital since March 2005.   Levin is a member of the DEC.   Levin received $74,995 in total compensation from Resource Capital in 2012, $104,993 in 2013, $104,996 in 2014, and $105,006 in 2015.  Upon information and belief, Levin is a citizen of Pennsylvania.

22.     Defendant P. Sherrill Neff ("Neff") has been a director of Resource Capital since March 2005, and was the Chair of the Company's Audit Committee between April 2012 and April 2016.  Neff received $74,995 in total compensation from Resource Capital in 2012, $119,999 in 2013, $119,996 in 2014, and $120,001 in total compensation from Resource Capital in 2015.  Neff is a citizen of Pennsylvania.

23.     Defendant Stephanie H. Wiggins ("Wiggins") has been a director of Resource Capital since June 2013, and was a member of the Company's Audit Committee between April

6

2015 and April 2016.  Wiggins received $72,008 in total compensation from Resource Capital in 2013, $104,999 in 2014, and $110,004 in 2015.  Wiggins is a citizen of Virginia.

24.     Defendant David J. Bryant ("Bryant") has been the Company's CFO, Senior Vice President, and Treasurer since June 2006.  Bryant is a defendant in the Securities Class Action. Bryant was paid $924,990 in total compensation from Resource Capital in 2012, $624,990 in 2013, $639,996 in 2014, and $674,998 in 2015.  Upon information and belief, Bryant is a citizen of Pennsylvania.

25.     Defendant Eldron C. Blackwell has served as the Company's CAO and Vice President since March 2014 and is a defendant in the Securities Class Action.  Upon information and belief, Blackwell is a citizen of Pennsylvania.

26.     Defendant David E. Bloom has served as the Company's Senior Vice President of Real Estate Investments since 2005 and is a defendant in the Securities Class Action.   Bloom was paid $799,997 in total compensation from Resource Capital in 2012, $299,997 in 2013, $149,996 in 2014, and $174,999 in 2015.  Upon information and belief, Bloom is a citizen of New Jersey.

27.     Resource Capital Manager, Inc. (the "Manager") is the Company's external manager.  Prior to September 2016, the Manager was a wholly-owned subsidiary of Resource America, Inc. ("Resource America").  In September 2016, Resource America was acquired by C-III Capital Partners ("C-III"), at which time C-III assumed control of the management agreement between the Manager and Resource Capital (the "Management Agreement").

28.     Defendants Kessler, Bryant, Blackwell, Bloom, Beach, E. Cohen, J. Cohen, Fore, Hart, Ickowicz, Levin, Neff, and Wiggins are sometimes referred to collectively herein as the "Individual Defendants."

7

## FACTUAL ALLEGATIONS

### A.    Overview of the Company

29.    Resource Capital is a diversified real estate finance company which invests in commercial and residential real estate assets and commercial finance assets.

30.    The Company is externally managed by the Manager.  Prior to September 2016, Manager was a wholly-owned subsidiary of Resource America.  In September 2016, Resource America was acquired by C-III.

31.    The Company's 2015 Form 10-K discloses:

Our management agreement was not negotiated at arm's-length and, as a result, may not be as favorable to us as if it had been negotiated with a third-party.

At the time the management agreement was negotiated, our officers and two of our directors, Edward E. Cohen and Jonathan Z. Cohen, were also officers or directors of the Manager or Resource America.  As a consequence, our management agreement was not the result of arm's-length negotiations and its terms, including fees payable, may not be as favorable to us as if it had been negotiated with an unaffiliated third-party.

32.    Pursuant to the Management Agreement, the Company must pay the Manager "a monthly base management fee equal to 1/12 of [the Company's] equity, as defined in the management agreement, times 1.50%, regardless of the performance of our portfolio." According to the Company's 2015 Form 10-K:  "[t]he Manager's entitlement to substantial non-performance based compensation might reduce its incentive to devote its time and effort to seeking profitable opportunities for our portfolio.  This in turn could hurt our ability to make distributions to our stockholders."

#2915089v.1

33. Ensuring that the Manager will not be easily replaced, the Management Agreement makes termination expensive and difficult:

> Termination of the management agreement by us without cause is difficult and could be costly.
>
> We may terminate the management agreement without cause only annually upon the affirmative vote of at least two-thirds of our independent directors or by a vote of the holders of at least a majority of our outstanding common stock, based upon unsatisfactory performance by the Manager that is materially detrimental to us or a determination that the management fee payable to the Manager is not fair.
>
> Moreover, with respect to a determination that the management fee is not fair, the Manager may prevent termination by accepting a mutually acceptable reduction of management fees. We must give not less than 180 days' prior notice of any termination. Upon any termination without cause, the Manager will be paid a termination fee equal to four times the sum of the average annual base management fee and the average annual incentive compensation earned by it during the two 12-month periods immediately preceding the date of termination, calculated as of the end of the most recently completed fiscal quarter before the date of termination.

### B.     Background to the Mezzanine Loan

34. In 2007, the Individual Defendants cause the Company to acquire the Mezzanine Loan. The Mezzanine Loan was backed by a portfolio of 13 luxury hotels owned by The Blackstone Group ("Blackstone"), including three hotels in Puerto Rico. The portfolio was also backed by approximately $742.5 million of debt securitized through the Wachovia Bank Commercial Mortgage Trust, 2007-WHALE8 (the "2007-WHALE8 Trust").

35. When the Individual Defendants caused the Company to acquire the Mezzanine Loan, Puerto Rico's economy, along with the entire U.S. economy, was falling into a recession. While the U.S. economy subsequently began a slow recovery, the Puerto Rican recession ballooned into a sovereign debt and economic crisis that continues today.

36. Due to the crisis, the assets backing the 2007-WHALE8 Trust lost significant value and rating agencies downgraded the securities issued by the 2007-WHALE8 Trust. On

#2915089v.1

December 9, 2010, Moody's Investors Service ("Moody's") announced that it had downgraded 11 classes of the 2007-WHALE8 Trust securities.

37.     On July 26, 2012, Moody's issued a press release announcing that it had downgraded six classes of 2007-WHALE8 Trust securities and that when the Mezzanine Loan matured in May 2012, Blackstone had been unable to pay the lender, and the special servicer had granted a forbearance to Blackstone until August 2012.

38.     By September 2012, Blackstone was unable to meet its payment obligations and entered into a forbearance extension agreement providing for the sale or refinance of the assets by May 9, 2014, and completion and full repayment of the mortgage debt by September 9, 2014.

C.      **The Individual Defendants Misrepresent the Status of the Mezzanine Loan**

39.     On October 31, 2012, the Individual Defendants caused Resource Capital to hold a conference call to discuss the Company's financial results for the third quarter of 2012, during which J. Cohen stated:

> Our portfolio of loans continued to perform well….
>
> While our portfolio stayed constant for the quarter due to repayments from a legacy $28 million loan, legacy meaning made before the crisis, and another $6.5 million loan made in 2011, we underwrote and funded a series of, in my opinion, very attractive loans.  We are picking up pace and expect this portfolio to grow tremendously in the next few quarters, net of payoffs.

40.     During the call, defendant Bloom stated:

> Credit across the portfolio continues to trend in a positive direction with improving metrics across all asset classes.  The majority of the properties securing our loans are continuing to realize improved cash flow on a quarter-over-quarter basis.  And the entire portfolio remains performing with no defaults….

41.     On November 9, 2012, the Individual Defendants caused Resource Capital to file with the SEC its Form 10-Q for the quarter ended September 30, 2012.  The Form 10-Q failed to disclose the Company's increasing exposure to Puerto Rico's economic crisis due to the

10

Mezzanine Loan.  In the Form 10-Q, the Individual Defendants also materially misrepresented the risk level of Resource Capital's commercial real estate loans portfolio by causing the Company to state that "[a]ll of the Company's commercial real estate loans were performing as of September 30, 2012 and December 31, 2011."  The Form 10-Q also disclosed:

**Commercial Real Estate Loans**

The Company uses a risk grading matrix to assign grades to commercial real estate loans. Loans are graded at inception and updates to assigned grades are made continually as new information is received. Loans are graded on a scale of 1-4 with 1 representing the Company's highest rating and 4 representing its lowest rating. The Company designates loans that are sold after the period end at the lower of their fair market value or cost, net of any allowances and costs associated with the loan sales. In addition to the underlying performance of the loan collateral, the Company considers such things as the strength of underlying sponsorship, payment history, collectability of interest, structural credit enhancements, market trends and loan terms in grading its commercial real estate loans.

Credit risk profiles of commercial real estate loans were as follows (in thousands):

| | Rating 1 | Rating 2 | Rating 3 | Rating 4 | Held for Sale | Total |
|---|---|---|---|---|---|---|
| **As of September 30, 2012:** | | | | | | |
| Whole loans | $ 415,782 | $ 7,000 | $ 98,874 | $ — | $ 34,000 | $ 555,656 |
| B notes | 16,357 | — | — | — | — | 16,357 |
| Mezzanine loans | 23,322 | — | 44,500 | — | — | 67,822 |
| | $ 455,461 | $ 7,000 | $ 143,374 | $ — | $ 34,000 | $ 639,835 |
| | | | | | | |
| **As of December 31, 2011:** | | | | | | |
| Whole loans | $ 329,085 | $ 87,598 | $ 90,225 | $ 37,765 | $ — | $ 544,673 |
| B notes | 16,435 | — | — | — | — | 16,435 |
| Mezzanine loans | 23,347 | — | 44,527 | — | — | 67,874 |
| | $ 368,867 | $ 87,598 | $ 134,752 | $ 37,765 | $ — | $ 628,982 |

All of the Company's commercial real estate loans were performing as of September 30, 2012 and December 31, 2011.

42.     On March 5, 2013, the Individual Defendants caused Resource Capital to hold a conference call to discuss the Company's fourth quarter and fiscal year 2012 financial results.

11

During the call, the Individual Defendants continued to represent that the Company's assets were performing well.  During the call, J. Cohen stated:

> Our credit quality is stable and improving and other than the legacy loans we have sold in our syndicated bank loan facility, we feel like the credit environment for us is excellent.  We took a modest provision on real estate loans in fourth quarter of $400,000.  However, all 43 of our outstanding real estate loans are performing and we see a trend of improving property performance underlying these loans beginning in 2011 through the year-end 2012 and continuing into 2013.  That is, our real estate loss is shrinking.

> * * *

> Our liquidity remains excellent.  We had approximately $180 million of cash including $94 million of unrestricted cash as of December 31, even after making considerable investment during the quarter.  Stay tuned for more investments.  Our portfolio of real estate loans continued to perform well.  During 2012, we have grown our real estate loan portfolio by over $175 million.

43.     On March 18, 2013, the Individual Defendants caused Resource Capital to file its 2012 Form 10-K with the SEC.  In the 2012 Form 10-K, which was signed by Kessler, J. Cohen, Beach, E. Cohen, Hart, Ickowicz, Levin, Neff, and Bryant, the Individual Defendants failed to disclose the Company's exposure to the Puerto Rican economic crisis, portrayed the geographic distribution of the portfolio as limited to the mainland United States, and omitted to disclose any information about the Company's increasing exposure to Puerto Rico's financial crisis due to the Mezzanine Loan.  In particular, the 2012 Form 10-K contained the following chart representing the geographic distribution of Resource Capital's commercial real estate loan portfolio, which omitted exposure to Puerto Rico:



44.     In the 2012 Form 10-K, the Individual Defendants also misrepresented the risk level of Resource Capital's commercial real estate loans portfolio: "[a]ll of our commercial real estate loans were performing as of December 31, 2012 and 2011," thereby concealing the Company's increased risk with respect to its mezzanine loans involving Puerto Rican assets:

**Commercial Real Estate Loans**

We use a risk grading matrix to assign grades to commercial real estate loans. Loans are graded at inception and updates to assigned grades are made continually as new information is received. Loans are graded on a scale of 1-4 with 1 representing our highest rating and 4 representing our lowest rating. We designate loans that are sold after the period end at the lower of our fair market value or cost, net of any allowances and costs associated with the loan sales. In addition to the underlying performance of the loan collateral, we consider such things as the strength of underlying sponsorship, payment history, collectability of interest, structural credit enhancements, market trends and loan terms in grading our commercial real estate loans.

Credit risk profiles of commercial real estate loans were as follows (in thousands):

13

|  | Rating 1 | Rating 2 | Rating 3 | Rating 4 | Held for Sale | Total |
|---|---|---|---|---|---|---|
| **As of December 31, 2012:** | | | | | | |
| Whole loans | $ 427,456 | $ — | $ 106,482 | $ — | $ 34,000 | $ 567,938 |
| B notes | 16,327 | — | — | — | — | 16,327 |
| Mezzanine loans | 38,296 | — | 44,490 | — | — | 82,786 |
| | $ 482,079 | $ — | $ 150,972 | $ — | $ 34,000 | $ 667,051 |
| | | | | | | |
| **As of December 31, 2011:** | | | | | | |
| Whole loans | $ 329,085 | $ 87,598 | $ 90,225 | $ 37,765 | $ — | $ 544,673 |
| B notes | 16,435 | — | — | — | — | 16,435 |
| Mezzanine loans | 23,347 | — | 44,527 | — | — | 67,874 |
| | $ 368,867 | $ 87,598 | $ 134,752 | $ 37,765 | $ — | $ 628,982 |

All of our commercial real estate loans were performing as of December 31, 2012 and 2011.

45.     The $44.49 million in mezzanine loans that the Individual Defendants classified in the Form 10-K as "Rating 3" as of December 31, 2012 was essentially unchanged from the $44.50 million that they stated were "Rating 3" in the third quarter 2012 Form 10-Q, notwithstanding the forbearance agreement and the fact that the Company stopped receiving cash income from the loan in September 2012.

46.     On May 8, 2013, the Individual Defendants caused Resource Capital to hold a conference call to discuss the Company's financial results for the first quarter of 2013.  During the call, defendant Bloom stated:

> We note improving metrics across all asset classes with the majority of the properties securing our loans realizing improved cash flow year-over-year and continuing to trend in an upward direction.  In addition, we are pleased to see the majority of the asset specific business plans across the portfolio are well on track and progressing towards the realization of borrowers' plans for value creation and the entire portfolio remains performing with no defaults.

47.     During the call, J. Cohen stated:

> Our portfolio of real estate loans continue to perform well.  During the last 12 months we have grown our real estate loan portfolio by over $223 million on a gross origination basis.  We expect this trend to continue as our real estate debt

14

team continues to find good opportunities to lend money against good real estate. We have greatly strived to grow our origination channel and we believe the investments we have made in our team and systems will start to pay off.

48.     On May 10, 2013, the Individual Defendants caused Resource Capital to file with the SEC its Form 10-Q for the quarter ended March 31, 2013.  The Form 10-Q failed to disclose the Company's increasing exposure to the Puerto Rican economic crisis due to the Mezzanine Loan and portrayed the geographic distribution of the portfolio as limited to the mainland United States.  The Form 10-Q falsely stated that "[a]ll of the Company's commercial real estate loans were performing as of March 31, 2013 and December 31, 2012," thereby concealing the Company's increased risk with respect to its mezzanine loans involving Puerto Rican assets:

**Commercial Real Estate Loans**

The Company uses a risk grading matrix to assign grades to commercial real estate loans.  Loans are graded at inception and updates to assigned grades are made continually as new information is received.  Loans are graded on a scale of 1-4 with 1 representing the Company's highest rating and 4 representing its lowest rating.  The Company designates loans that are sold after the period end at the lower of their fair market value or cost, net of any allowances and costs associated with the loan sales. In addition to the underlying performance of the loan collateral, the Company considers metrics such as the strength of underlying sponsorship, payment history, collectability of interest, structural credit enhancements, market trends and loan terms in grading its commercial real estate loans.

Credit risk profiles of commercial real estate loans were as follows (in thousands):

| | Rating 1 | Rating 2 | Rating 3 | Rating 4 | Held for Sale | Total |
|---|---|---|---|---|---|---|
| **As of March 31, 2013** | | | | | | |
| Whole loans | $ 497,052 | $  — | $  53,362 | $  — | $  — | $ 550,414 |
| B notes | 16,293 | | — | | — | 16,293 |
| Mezzanine loans | 44,704 | — | 38,072 | — | — | 82,776 |
| | $ 558,049 | $  — | $  91,434 | $  — | $  — | $ 649,483 |
| | | | | | | |
| **As of December 31, 2012** | | | | | | |
| Whole loans | $ 427,456 | $  — | $  106,482 | $  — | $  34,000 | $ 567,938 |
| B notes | 16,327 | — | — | — | — | 16,327 |
| Mezzanine loans | 38,296 | — | 44,490 | — | — | 82,786 |
| | $ 482,079 | $  — | $ 150,972 | $  — | $  34,000 | $ 667,051 |

All of the Company's commercial real estate loans were performing as of March 31, 2013 and December 31, 2012.

49.     Notably, the Individual Defendants classified $38.07 million in mezzanine loans as "Rating 3" as of March 31, 2013, despite the fact that the loan was not performing.

50.     On August 7, 2013, the Individual Defendants caused Resource Capital to hold a conference call to discuss the Company's financial results for the second quarter of 2013, during the call, defendant Bloom stated:

> Credit across the portfolio continues to trend in a positive direction with improving metrics across all asset classes.  The majority of the properties securing our loans are continuing to realize improved cash flow and we are seeing borrowers' plans for value creation on or ahead of budget.  Once again I am pleased to report that the entire portfolio is performing with no defaults.

51.     During the call, defendant Bryant stated:

> Overall real estate credit has been excellent and to reiterate Jonathan's point, I characterize our bank loan portfolio credit as improving.  Five bank loans totaling $12.6 million are delinquent out of a total portfolio of $1.1 billion and remarkably, all of our 49 real estate loans are current and performing.

52.     On August 9, 2013, the Individual Defendants caused Resource Capital to file with the SEC its Form 10-Q for the quarter ended June 30, 2013.  The Form 10-Q failed to disclose the Company's increasing exposure to the Puerto Rican economic crisis due to the Mezzanine Loan and portrayed the geographic distribution of the portfolio as limited to the mainland United States.  The Form 10-Q falsely stated that "[a]ll of the Company's commercial real estate loans were performing as of June 30, 2013 and December 31, 2012," thereby concealing the Company's increased risk with respect to its mezzanine loans involving Puerto Rican assets:

16

**Commercial Real Estate Loans**

The Company uses a risk grading matrix to assign grades to commercial real estate loans. Loans are graded at inception and updates to assigned grades are made continually as new information is received. Loans are graded on a scale of 1-4 with 1 representing the Company's highest rating and 4 representing its lowest rating. The Company also designates loans that are sold after the period end at the lower of their fair market value or cost, net of any allowances and costs associated with the loan sales, m addition to the underlying performance of the loan collateral, the Company considers metrics such as the strength of underlying sponsorship, payment history, collectability of interest, structural credit enhancements, market trends and loan terms in grading its commercial real estate loans.

Credit risk profiles of commercial real estate loans were as follows (in thousands):

| | Rating 1 | Rating 2 | Rating 3 | Rating 4 | Held for Sale | Total |
|---|---|---|---|---|---|---|
| **As of June 30, 2013** | | | | | | |
| Whole loans | $ 553,333 | $ — | $ 55,374 | $ — | $ — | $ 608,707 |
| B notes | 16,265 | — | — | — | — | 16,265 |
| Mezzanine loans | 28,938 | — | 38,072 | — | — | 67,010 |
| | $ 598,536 | $ — | $ 93,446 | $ — | $ — | $ 691,982 |
| | | | | | | |
| **As of December 31, 2012** | | | | | | |
| Whole loans | $ 427,456 | $ — | $ 106,482 | $ — | $ 34,000 | $ 567,938 |
| B notes | 16,327 | — | — | — | — | 16,327 |
| Mezzanine loans | 38,296 | — | 44,490 | — | — | 82,786 |
| | $ 482,079 | $ — | $ 150,972 | $ — | $ 34,000 | $ 667,051 |

All of the Company's commercial real estate loans were performing as of June 30, 2013 and December 31, 2012.

53.    Notably, the Individual Defendants classified $38.07 million in mezzanine loans as "Rating 3" as of June 30, 2013, despite the fact that the loan was not performing. The Individual Defendants also misrepresented that there were no mezzanine loans included in the category of "troubled-debt restructurings" as of June 30, 2013:

**Troubled-Debt Restructurings**

The following tables show troubled-debt restructurings in the Company's loan portfolio (in thousands):

17

| | Number of Loans | Pre-Modification Outstanding Recorded Balance | Post-Modification Outstanding Recorded Balance |
|---|---|---|---|
| **Three Months Ended June 30, 2013:** | | | |
| Whole loans | — | $ — | $ — |
| B notes | — | — | — |
| **Mezzanine loans** | — | — | — |
| Bank loans | — | — | — |
| Loans receivable - related party | — | — | — |
| Total loans | — | $ — | $ — |
| | | | |
| **Three Months Ended June 30, 2012:** | | | |
| Whole loans | — | $ — | $ — |
| B notes | — | — | — |
| **Mezzanine loans** | — | — | — |
| Bank loans | — | — | — |
| Loans receivable | — | — | — |
| Loans receivable - related party | — | — | — |
| Total loans | — | $ — | $ — |
| **Six Months Ended June 30, 2013:** | | | |
| Whole loans | 2 | $ 56,328 | $ 56,328 |
| B notes | — | — | — |
| **Mezzanine loans** | — | — | — |
| Bank loans | — | — | — |
| Loans receivable - related party | 1 | 6,592 | 6,592 |
| Total loans | 3 | $ 62,920 | $ 62,920 |
| | | | |
| **Six Months Ended June 30, 2012:** | | | |
| Whole loans | 3 | $ 92,912 | $ 76,597 |
| B notes | — | — | — |
| **Mezzanine loans** | — | — | — |
| Bank loans | — | — | — |
| Loans receivable | — | — | — |
| Loans receivable - related party | 1 | 7,797 | 7,797 |
| Total loans | 4 | $ 100,709 | $ 84,394 |

_____

As of June 30, 2013 and December 31, 2012, there were no troubled-debt restructurings that subsequently defaulted.

54.     On November 6, 2013, the Individual Defendants caused Resource Capital to hold a conference call to discuss the Company's financial results for the third quarter of 2013.  During the call, defendant Bryant stated:

#2915089v.1

Overall, real estate credit has been excellent and I'd characterize the bank loan portfolio credit as very benign.   Three bank loans totaling $3.6 million are delinquent out of a portfolio of approximately $940 million and remarkably, all of our real estate loans are current and performing.

55.    During the call, defendant Bloom stated:

We are improving metrics across all asset classes with the majority of the property securing our loans realizing improved cash flow on a year-over-year basis and continuing to trend in upward direction.   In addition, we are pleased to see that the majority of the asset specific plans across the portfolio are well on track and progressing towards realization ultimately of the borrowers' plans for value creation and the entire portfolio remains performing with no defaults.   We are very particular about markets in which we lend, sponsor quality and asset-specific business plans and the resilience of the assets I just described is a daily reminder that validates our keen focus on credit first approach to our business.

56.    On November 12, 2013, the Individual Defendants caused Resource Capital to file with the SEC its Form 10-Q for the quarter ended September 30, 2013.   The Form 10-Q failed to disclose the Company's increasing exposure to the Puerto Rican economic crisis due to the Mezzanine Loan and portrayed the geographic distribution of the portfolio as limited to the mainland United States.   The Form 10-Q falsely stated that "[a]ll of the Company's commercial real estate loans were performing as of September 30, 2013 and December 31, 2012," thereby omitting to disclose the Company's increased risk with respect to its mezzanine loans involving Puerto Rican assets:

**Commercial Real Estate Loans**

The Company uses a risk grading matrix to assign grades to commercial real estate loans.   Loans are graded at inception and updates to assigned grades are made continually as new information is received.   Loans are graded on a scale of 1-4 with 1 representing the Company's highest rating and 4 representing its lowest rating.   The Company also designates loans that are sold after the period end at the lower of their fair market value or cost, net of any allowances and costs associated with the loan sales, in addition to the underlying performance of the loan collateral, the Company considers metrics such as the strength of underlying sponsorship, payment history, collectability of interest, structural credit enhancements, market trends and loan terms in grading its commercial real estate loans.

19

Credit risk profiles of commercial real estate loans were as follows (in thousands):

| | Rating 1 | Rating 2 | Rating 3 | Rating 4 | Held for Sale | Total |
|---|---|---|---|---|---|---|
| **As of September 30, 2013** | | | | | | |
| Whole loans | $ 591,105 | $ 44,943 | $ 32,067 | $ — | $ — | $ 668,115 |
| B notes | 16,238 | — | — | — | — | 16,238 |
| Mezzanine loans | 57,574 | — | — | — | — | 57,574 |
| | $ 664,917 | $ 44,943 | $ 32,067 | $ — | $ — | $ 741,927 |
| | | | | | | |
| **As of December 31, 2012** | | | | | | |
| Whole loans | $ 427,456 | $ — | $ 106,482 | $ — | $ 34,000 | $ 567,938 |
| B notes | 16,327 | — | — | — | — | 16,327 |
| Mezzanine loans | 38,296 | — | 44,490 | — | — | 82,786 |
| | $ 482,079 | $ — | $ 150,972 | $ — | $ 34,000 | $ 667,051 |

All of the Company's commercial real estate loans were performing as of September 30, 2013 and December 31, 2012.

57.     Notably, the Individual Defendants misrepresented the status of the mezzanine loan by describing it as Rating 1.  The Individual Defendants also misrepresented that there were no mezzanine loans included in the category of "troubled-debt restructurings" as of September 30, 2013:

**Troubled-Debt Restructurings:**

The following tables show troubled-debt restructurings in the Company's loan portfolio (in thousands):

| | Number of Loans | Pre-Modification Outstanding Recorded Balance | Post-Modification Outstanding Recorded Balance |
|---|---|---|---|
| **Three Months Ended September 30, 2013:** | | | |
| Whole loans | 2 | $ 48,374 | $ 52,716 |
| B notes | — | — | — |
| Mezzanine loans | — | — | — |
| Bank loans | — | — | — |
| Loans receivable - related party | — | — | — |
| Total loans | 2 | $ 48,374 | $ 52,716 |
| | | | |
| **Three Months Ended September 30, 2012:** | | | |
| Whole loans | 2 | $ 42,550 | $ 42,550 |
| B notes | — | — | — |
| Mezzanine loans | 1 | 38,072 | 38,072 |
| Bank loans | — | — | — |
| Loans receivable | — | — | — |
| Loans receivable - related party | — | — | — |
| Total loans | 3 | $ 80,622 | $ 80,622 |
| **Nine Months Ended September 30, 2013:** | | | |
| Whole loans | 4 | $ 104,702 | $ 109,044 |
| B notes | — | — | — |
| Mezzanine loans | — | — | — |
| Bank loans | — | — | — |
| Loans receivable - related party | 1 | 6,592 | 6,592 |
| Total loans | 5 | $ 111,294 | $ 115,636 |
| | | | |
| **Nine Months Ended September 30, 2012:** | | | |
| Whole loans | 5 | $ 168,708 | $ 151,422 |
| B notes | — | — | — |
| Mezzanine loans | 1 | 38,072 | 38,072 |
| Bank loans | — | — | — |
| Loans receivable | — | — | — |
| Loans receivable - related party | 1 | 7,797 | 7,797 |
| Total loans | 7 | $ 214,577 | $ 197,291 |

As of September 30, 2013 and December 31, 2012, there were no troubled-debt restructurings that subsequently defaulted.

58.     On February 26, 2014, weeks after all three major credit rating agencies had downgraded Puerto Rico's debt to junk status, the Individual Defendants caused Resource Capital to hold a conference call to discuss the Company's financial results for the fourth quarter

and fiscal year 2013.  During the call, defendant Bryant stated that "all 57 of our real estate loans are current and performing."  Defendant Bloom stated:

> We're again pleased to report that the entire RSO commercial mortgage portfolio is performing with no defaults.  We're very particular about markets in which we lend, while additional markets continued to recover the depth and breadth of a given market, sponsor experience and asset specific business plans all play heavily in our underwriting process.  In addition although we're lending on lightly transitional properties, we continue to target properties with stabilized projections that stand up to rigorous stressed underwriting and verification with day one cash flow coverage and meaningful sponsor equity.

59.     On March 3, 2014, the Individual Defendants caused Resource Capital to file with the SEC its annual report on Form 10-K for the year ended December 31, 2013.  In the Form 10-K, which was signed by Kessler, J. Cohen, Beach, E. Cohen, Fore, Hart, Ickowicz, Levin, Neff, Wiggins, and Bryant, the Individual Defendants concealed the Company's exposure to the Puerto Rican economic crisis and misrepresented the geographic distribution of the portfolio as limited to the mainland United States.  For example, the Form 10-K contained the following chart depicting the geographic distribution of Resource Capital's commercial real estate loan portfolio:



Geographic Area by State

60.    In the Form 10-K, the Individual Defendants also misrepresented that all necessary provisions for loan loss and impairments had been made by the Company:

> Although economic conditions in the United States have improved, previous conditions in real estate and credit markets continue to affect both us and a number of our commercial real estate borrowers.  Over a period of several years, we entered into loan modifications with respect to 17 of our outstanding commercial real estate loans.  During the past three years, we have added to our provision for loan losses to reflect the effect of these conditions on our borrowers and have recorded both temporary and other than temporary impairments in the market valuation of CMBS and ABS in our investment portfolio.  However, during 2012 and into December 31, 2013, the improved economic conditions led to a stabilization in the credit quality of our portfolio and, as a result, our provision for loan losses has decreased significantly for 2013.  We expensed provisions of $3.0 million for the year ended December 31, 2013 as compared to provisions of $16.8 million for the year ended December 31, 2012.  Our asset impairments have increased slightly, we recognized asset impairments of $863,000 for the year ended December 31, 2013 as compared to $180,000 for the year ended December 31, 2012.  We also saw a marked improvement in other comprehensive income with respect to our available for safe securities portfolio and interest rate derivatives, which declined to a loss of $14.0 million at December 31, 2013 from a loss of $27.1 million at December 31, 2012.  While we

23

believe we have appropriately valued the assets in our investment portfolio at December 31, 2013, we cannot assure you that further impairments will not occur or that our assets will otherwise not be adversely affected by market conditions.

61.     In the Form 10-K, the Individual Defendants also falsely stated: "[a]ll of our commercial real estate loans were performing as of December 31, 2013 and 2012," thereby omitting to disclose the Company's increased risk with respect to its mezzanine loans involving Puerto Rican assets:

**Commercial Real Estate Loans**

We use a risk grading matrix to assign grades to commercial real estate loans. Loans are graded at inception and updates to assigned grades are made continually as new information is received.  Loans are graded on a scale of 1-4 with 1 representing our highest rating and 4 representing our lowest rating.  We designate loans that are sold after the period end at the lower of our fair market value or cost, net of any allowances and costs associated with the loan sales. In addition to the underlying performance of the loan collateral, we consider such things as the strength of underlying sponsorship, payment history, collectability of interest, structural credit enhancements, market trends and loan terms in grading our commercial real estate loans.

Credit risk profiles of commercial real estate loans were as follows (in thousands):

| | Rating 1 | Rating 2 | Rating 3 | Rating 4 | Held for Sale | Total |
|---|---|---|---|---|---|---|
| **As of December 31, 2013:** | | | | | | |
| Whole loans | $ 680,718 | $ 32,500 | $ 32,571 | $ — | $ — | $ 745,789 |
| B notes | 16,205 | — | — | — | — | 16,205 |
| Mezzanine loans | 51,862 | 12,455 | — | — | — | 64,317 |
| | $ 748,785 | $ 44,955 | $ 32,571 | $ — | $ — | $ 826,311 |
| | | | | | | |
| **As of December 31, 2012:** | | | | | | |
| Whole loans | $ 427,456 | $ — | $ 106,482 | $ — | $ 34,000 | $ 567,938 |
| B notes | 16,327 | — | — | — | — | 16,327 |
| Mezzanine loans | 38,296 | — | 44,490 | — | — | 82,786 |
| | $ 482,079 | $ — | $ 150,972 | $ — | $ 34,000 | $ 667,051 |

All of our commercial real estate loans were performing as of December 31, 2013 and 2012.

24

62.     In the 2013 Form 10-K, the Individual Defendants also falsely claimed the Company had no mezzanine loans included in the category of "troubled-debt restructurings" as of December 31, 2013:

**Troubled-Debt Restructurings**

The following tables show troubled-debt restructurings in our loan portfolio (in thousands):

| | Number of Loans | Pre-Modification Outstanding Recorded Balance | Post-Modification Outstanding Recorded Balance |
|---|---|---|---|
| **Year Ended December 31, 2013:** | | | |
| Whole loans | 5 | $ 143,484 | $ 147,826 |
| B notes | — | — | — |
| **Mezzanine loans** | — | — | — |
| Bank loans | — | — | — |
| Residential mortgage loans | — | — | — |
| Loans receivable - related party | 1 | 6,592 | 6,592 |
| Total loans | 6 | $ 150,076 | $ 154,418 |
| | | | |
| **Year Ended December 31, 2012:** | | | |
| Whole loans | 6 | $ 143,261 | $ 126,946 |
| B notes | — | — | — |
| Mezzanine loans | 1 | 38,072 | 38,072 |
| Bank loans | — | — | — |
| Loans receivable - related party | 1 | 7,797 | 7,797 |
| Total loans | 8 | $ 189,130 | $ 172,815 |

As of December 31, 2013 and 2012, there were no troubled-debt restructurings that subsequently defaulted.

63.     On March 13, 2014, defendant Bloom filed with the SEC a Form 4 with the SEC disclosing that on March 11, 2014, he had sold 29,000 shares of Resource Capital stock at prices ranging from $5.78 per share to $5.80 per share, and on March 12, 2014, he had sold an additional 8,165 shares of Resource Capital stock at prices ranging from $5.76 per share to $5.79 per share, for total proceeds of approximately $214,867.  Prior to the sale on March 11, 2014,

25

Bloom had not sold any Resource Capital stock for nearly three years, and the two transactions represented the liquidation of 20% his vested shares at the time.

64.     On May 1, 2014, Moody's issued a press release announcing that it had affirmed its previously issued ratings for the 2007-WHALE8 Trust securities.   The ratings on classes LXR-l and LXR-2 remained Caa1 and Caa3,[1] respectively.   The press release also stated:

> The largest loan in the pool is secured by fee interests in LXR Hospitality Pool Loan ($599 million, or 68% of the pooled balance plus $124 million of non-pooled, or rake bonds within the trust).   The remaining hotels include eight properties located in Arizona, Florida, Puerto Rico, and Jamaica. The Park Shore Waikiki, HI, Golden Door Spa in San Marcos, CA, Miami Beach Resort & Spa, FL, Wyndham Garden LaGuardia, NY, and The London West Hollywood, CA have been released to date.   The sponsor is The Blackstone Group.   There is additional debt in the form of non-trust junior component and mezzanine debt outside the trust.

> The previous special servicer (Bank of America, N.A.) completed a Forbearance Extension and Property Disposition Cooperation Agreement in September 2012. The plan provides for principal pay down from sale or refinance in the total amount of $447.45 million by May 9, 2014, and full repayment of the mortgage debt on September 9, 2014.   The borrower has requested an additional time and modification to the existing forbearance agreement at this time.   The current special servicer (Key Bank, National Association) is in discussions with the borrower.

65.     Additionally, as of May 1, 2014, Fitch Ratings downgraded the 2007-WHALE8 Trust due to "[p]erformance overall… significantly below issuance expectations."

66.     On May 7, 2014, the Individual Defendants caused Resource Capital to conduct a conference call to discuss the Company's financial results for the first quarter of 2014.   During the call, defendant Bloom stated:

> Credit across the portfolio continues to trend in very positive direction, with improving metrics across all assets classes.   The majority of the properties securing our loans are continuing to realize improved cash flow and receiving borrower's plans for value creation well on or ahead of track.   Once again, I'm

---

[1]     According to Moody's, "[o]bligations rated Caa are judged to be speculative of poor standing and are subject to very high credit risk."

pleased to report that the entire commercial real estate loan portfolio is performing with no defaults.

67.     During the call, defendant J. Cohen also stated:

Our credit quality continues to be very solid, our real estate watch-list is shrinking and we reverse $4.6 million of the specific allowance in the first quarter as a result of the pending sale by the borrower on the property of a legacy the whole loan that will pay down the existing balance and further reduce our legacy loan portfolio.

68.     On May 9, 2014, the Individual Defendants caused Resource Capital to file with the SEC its Form 10-Q for the quarter ended March 31, 2014.  The Form 10-Q concealed the Company's exposure to the Puerto Rican economic crisis misrepresented the geographic distribution of the portfolio as limited to the mainland United States and misrepresented the risk level of Resource Capital's commercial real estate loans portfolio by stating that "[a]ll of the Company's commercial real estate loans were performing as of March 31, 2014 and December 31, 2013."  The Form 10-Q also disclosed:

**Commercial Real Estate Loans**

The Company uses a risk grading matrix to assign grades to commercial real estate loans.  Loans are graded at inception and updates to assigned grades are made continually as new information is received.  Loans are graded on a scale of 1-4 with 1 representing the Company's highest rating and 4 representing its lowest rating.  The Company also designates loans that are sold after the period ends at the lower of their fair market value or cost, net of any allowances and costs associated with the loan sales.  In addition to the underlying performance of the loan collateral, the Company considers metrics such as the strength of underlying sponsorship, payment history, collectability of interest, structural credit enhancements, market trends and loan terms in grading its commercial real estate loans.

Credit risk profiles of commercial real estate loans were as follows (in thousands):

27

| | Rating 1 | Rating 2 | Rating 3 | Rating 4 | Held for Sale | Total |
|---|---|---|---|---|---|---|
| **As of March 31 2014** | | | | | | |
| Whole loans | $ 768,243 | $ 32,500 | $ 33,110 | $ — | $ — | $ 833,853 |
| B notes | 16,168 | — | — | — | — | 16,168 |
| Mezzanine loans | 51,832 | 12,467 | — | — | — | 64,299 |
| | $ 836,243 | $ 44,967 | $ 33,110 | $ — | $ — | $ 914,320 |
| | | | | | | |
| **As of December 31, 2013** | | | | | | |
| Whole loans | $ 680,718 | $ 32,500 | $ 32,571 | $ — | $ — | $ 745,789 |
| B notes | 16,205 | — | — | — | — | 16,205 |
| Mezzanine loans | 51,862 | 12,455 | — | — | — | 64,317 |
| | $ 748,785 | $ 44,955 | $ 32,571 | $ — | $ — | $ 826,311 |

All of the Company's commercial real estate loans were performing as of March 31, 2014 and December 31, 2013.

69.     In the Form 10-Q, the Individual Defendants also falsely represented that there were no mezzanine loans included in the category of "troubled-debt restructurings" as of March 31, 2014:

**Troubled-Debt Restructurings**

The Company had no troubled-debt restructurings during the three months ended March 31, 2014.

The following table shows troubled-debt restructurings in the Company's loan portfolio (in thousands) during the three months ended March 31, 2013:

| | Number of Loans | Pre-Modification Outstanding Recorded Balance | Post-Modification Outstanding Recorded Balance |
|---|---|---|---|
| Whole loans | 6 | $ 153,958 | $ 136,672 |
| B notes | — | — | — |
| Mezzanine loans | 1 | 38,072 | 38,072 |
| Bank loans | — | — | — |
| Residential mortgage loans | — | — | — |
| Loans receivable - related party | 1 | 7,797 | 7,797 |
| Total loans | 8 | $ 199,827 | $ 182,541 |

As of March 31, 2014 and 2013, there were no troubled-debt restructurings that subsequently defaulted.

28

70.     On August 6, 2014, the Individual Defendants caused Resource Capital to conduct a conference call to discuss the Company's financial results for second quarter 2014. During the call, defendant Bloom stated:

> We also note improving credit metrics across all asset classes represented in our commercial real estate portfolio.  The majority of the properties securing our loans are continuing to realize improved cash flow with borrowers' plans for value creation well on track.  I am once again pleased to report that the entire commercial real estate loan portfolio is performing with no defaults.

71.     During the call, defendant Bryant stated:

> Only one bank loan for $1.6 million is delinquent out of a portfolio of $765 million and again all of our real estate loans totaling $1,000,043,000 are current. Our leverage stands at 1.7 times at June 30.

72.     On August 8, 2014, the Individual Defendants caused Resource Capital to file with the SEC its Form 10-Q for the quarter ended June 30, 2014.  The Form 10-Q concealed the Company's exposure to the Puerto Rican economic crisis misrepresented the geographic distribution of the portfolio as limited to the mainland United States and misrepresented the risk level of Resource Capital's commercial real estate loans portfolio by stating that "[a]ll of the Company's commercial real estate loans were performing as of June 30, 2014 and December 31, 2013."  The Form 10-Q also disclosed:

**Commercial Real Estate Loans**

The Company uses a risk grading matrix to assign grades to commercial real estate loans.  Loans are graded at inception and updates to assigned grades arc made continually as new information is received.  Loans are graded on a scale of 1-4 with 1 representing the Company's highest rating and 4 representing its lowest rating.  The Company also designates loans that are sold after the period ends at the lower of their fair market value or cost, net of any allowances and costs associated with the loan sales.  In addition to the underlying performance of the loan collateral, the Company considers metrics such as the strength of underlying sponsorship, payment history, collectability of interest, structural credit enhancements, market trends and loan terms in grading its commercial real estate loans.

#2915089v.1

Credit risk profiles of commercial real estate loans were as follows (in thousands):

| | Rating 1 | Rating 2 | Rating 3 | Rating 4 | Held for Sale | Total |
|---|---|---|---|---|---|---|
| **As of June 30, 2014** | | | | | | |
| Whole loans | $ 900,246 | $ 32,500 | $ 22,000 | $ — | $ — | $ 954,746 |
| B notes | 16,138 | — | — | — | — | 16,138 |
| Mezzanine loans | 45,460 | 21,800 | — | — | — | 67,260 |
| | $ 961,844 | $ 54,300 | $ 22,000 | $ — | $ — | $ 1,038,144 |
| | | | | | | |
| **As of December 31, 2013** | | | | | | |
| Whole loans | $ 680,718 | $ 32,500 | $ 32,571 | $ — | $ — | 745,789 |
| B notes | 16,205 | — | — | — | — | 16,205 |
| Mezzanine loans | 51,862 | 12,455 | — | — | — | 64,317 |
| | $ 748,785 | $ 44,955 | $ 32,571 | $ — | $ — | $ 826,311 |

All of the Company's commercial real estate loans were current as of June 30, 2014 and December 31, 2013.

73.     In the Form 10-Q, the Individual Defendants also falsely stated that there were no mezzanine loans included in the category of "troubled-debt restructurings" as of June 30, 2014:

**Troubled-Debt Restructurings**

The Company had no troubled-debt restructurings during the three months ended June 30, 2014 and 2013 or during the six months ended June 30, 2014.

The following table shows troubled-debt restructurings in the Company's loan portfolio during the six months ended June 30, 2013 (in thousands):

| | Number of Loans | Pre-Modification Outstanding Recorded Balance | Post-Modification Outstanding Recorded Balance |
|---|---|---|---|
| **Six Months Ended June 30, 2013** | | | |
| Whole loans | 2 | $ 56,328 | $ 56,328 |
| B notes | — | — | — |
| Mezzanine loans | — | — | — |
| Bank loans | — | — | — |
| Residential mortgage loans | — | — | — |
| Loans receivable - related party | 1 | 6,592 | 6,592 |
| Total loans | 3 | $ 62,920 | $ 62,920 |

As of June 30, 2014 and 2013, there were no troubled-debt restructurings that subsequently defaulted.

30

74.     On November 4, 2014, the Individual Defendants caused Resource Capital to conduct a conference call to discuss the Company's financial results for third quarter of 2014. During the call, defendant Bloom stated: "I am once again pleased to report that the entire commercial real estate portfolio is performing with no defaults." Defendant Bryant stated: "[T]wo bank loans for $2.3 million are delinquent out of a portfolio of $712 million, just 32 basis points, and all of our 65 real estate loans totaling $1.1 billion are current."

75.     On November 10, 2014, the Individual Defendants caused Resource Capital to file with the SEC its Form 10-Q for the quarter ended September 30, 2014. The Form 10-Q concealed the Company's exposure to the Puerto Rican economic crisis misrepresented the geographic distribution of the portfolio as limited to the mainland United States and misrepresented the risk level of Resource Capital's commercial real estate loans portfolio by stating that "[a]ll of the Company's commercial real estate loans were performing as of September 30, 2014 and December 31, 2013." The Form 10-Q also disclosed:

**Commercial Real Estate Loans**

The Company uses a risk grading matrix to assign grades to commercial real estate loans. Loans are graded at inception and updates to assigned grades are made continually as new information is received. Loans are graded on a scale of 1-4 with 1 representing the Company's highest rating and 4 representing its lowest rating. The Company also designates loans that are sold after the period ends at the lower of their fair market value or cost, net of any allowances and costs associated with the loan sales. In addition to the underlying performance of the loan collateral, the Company considers factors such as the strength of underlying sponsorship, payment history, collectability of interest, structural credit enhancements, market trends and loan terms in grading its commercial real estate loans.

Credit risk profiles of commercial real estate loans were as follows (in thousands):

#2915089v.1

| | Rating 1 | Rating 2 | Rating 3 | Rating 4 | Held for Sale | Total |
|---|---|---|---|---|---|---|
| **As of September 30, 2014** | | | | | | |
| Whole loans | $ 990,471 | $ 32,500 | $ — | $ — | $ — | $ 1,022,971 |
| B notes | 16,107 | — | — | — | — | 16,107 |
| Mezzanine loans | 45,447 | 21,858 | — | — | — | 67,305 |
| | $ 1,052,025 | $ 54,358 | $ — | $ — | $ — | $ 1,106,383 |
| | | | | | | |
| **As of December 31, 2013** | | | | | | |
| Whole loans | $ 680,718 | $ 32,500 | $ 32,571 | $ — | $ — | $ 745,789 |
| B notes | 16,205 | — | — | — | — | 16,205 |
| Mezzanine loans | 51,862 | 12,455 | — | — | — | 64,317 |
| | $ 748,785 | $ 44,955 | $ 32,571 | $ — | $ — | $ 826,311 |

All of the Company's commercial real estate loans were current as of September 30, 2014 and December 31, 2013.

76.     On February 26, 2015, the Individual Defendants caused Resource Capital to conduct a conference call to discuss the Company's financial results for the fourth quarter and fiscal year 2014.  During the call, defendant Bloom stated:

> We will continue to utilize our $600 million term financing facilities to support the growth of our new loan originations, and we plan to access the CLO market to optimally match fund our assets on a regular basis.  We know improving credit metrics across all asset classes represented in our commercial real estate loan portfolio, the majority of the properties securing our loans continuing to realize improved cash flow with borrowers' plans for value creation well on track.  I am once again pleased to report the entire commercial real estate loan portfolio is performing with no defaults.

77.     During the call, defendant Bryant stated:

> Two bank loans for $1.4 million are delinquent out of a portfolio of $323 million, 41 basis points and all 78 of our real estate loans are current. Of note, for Q4 we were able to sell off two remaining real estate properties for gains of $3.2 million, bringing 2014 gains to $6.1 million.

78.     On March 2, 2015, the Individual Defendants caused Resource Capital to file with the SEC its Form 10-K for the year ended December 31, 2014.  In the Form 10-K, which was signed by Kessler, J. Cohen, Beach, E. Cohen, Fore, Hart, Ickowicz, Levin, Neff, Wiggins, Bryant, and Blackwell, the Individual Defendants concealed the Company's exposure to the

Puerto Rican economic crisis and depicted the geographic distribution of the portfolio as limited to the mainland United States.   For example, the Form 10-K included the following chart showing geographic distribution of Resource Capital's commercial real estate loan portfolio:



79.     The Form 10-K also stated:

Although economic conditions in the United States have improved, previous conditions in real estate and credit markets continue to affect both us and a number of our commercial real estate borrowers.  Over a period of several years, we entered into loan modifications with respect to 14 of our remaining outstanding commercial real estate loans.  During the past 21 months, we have adjusted our provision for loan losses to reflect the effect of these conditions on our borrowers as well as, where necessary, market-related temporary adjustments to the market valuations of both CMBS and ABS in our investment portfolio.  However, during 2013 and continuing through December 31, 2014, the improved economic conditions led to a stabilization in the credit quality of our portfolio and, as a result, our provision for loan losses has decreased significantly in 2014.  For the year ended December 31, 2014, we have a net recovery in the provision for loan losses of $1.8 million, primarily due to the successful refinancing of a commercial real estate loan position on which we had previously established a significant reserve for credit loss.  Also, other comprehensive income saw an increase of $20.1 million at December 31, 2014.  While we believe we have appropriately valued the assets in our investment portfolio at December 31, 2014, we cannot assure you that further impairments will not occur or that our assets will otherwise not be adversely affected by market conditions.

80.     In the Form 10-K, the Individual Defendants also falsely described the risk level of Resource Capital's commercial real estate loan portfolio: "[a]ll of our commercial real estate loans were performing as of December 31, 2014 and 2013."  The Form 10-K further disclosed:

**Commercial Real Estate Loans**

We use a risk grading matrix to assign grades to commercial real estate loans. Loans are graded at inception and updates to assigned grades are made continually as new information is received. Loans are graded on a scale of 1-4 with 1 representing our highest rating and 4 representing our lowest rating.  We value loans that are sold after the period end at the lower of our fair market value or cost, net of any allowances and costs associated with the loan sales.  In addition to the underlying performance of the loan collateral, we consider such things as the strength of underlying sponsorship, payment history, collectability of interest, structural credit enhancements, market trends and loan terms in grading our commercial real estate loans.

Credit risk profiles of commercial real estate loans were as follows (in thousands):

| | Rating 1 | Rating 2 | Rating 3 | Rating 4 | Held for Sale | Total |
|---|---|---|---|---|---|---|
| **As of December 31, 2014:** | | | | | | |
| Whole loans | $ 1,231,092 | $ 32,500 | $ — | $ — | $ — | $ 1,263,592 |
| B notes | 16,072 | — | — | — | — | 16,072 |
| Mezzanine loans | 45,432 | 21,934 | — | — | — | 67,366 |
| | $ 1,292,596 | $ 54,434 | $ — | $ — | $ — | $ 1,347,030 |
| | | | | | | |
| **As of December 31, 2013:** | | | | | | |
| Whole loans | $ 680,718 | $ 32,500 | $ 32,571 | $ — | $ — | $ 745,789 |
| B notes | 16,205 | — | — | — | — | 16,205 |
| Mezzanine loans | 51,862 | 12,455 | — | — | — | 64,317 |
| | $ 748,785 | $ 44,955 | $ 32,571 | $ — | $ — | $ 826,311 |

All of our commercial real estate loans were performing as of December 31, 2014 and 2013.

81.     On May 6, 2015, the Individual Defendants caused Resource Capital to conduct a conference call to discuss the Company's financial results for the first quarter of 2015.  During the call, defendant Bloom stated:

I am once again pleased to report that the entire commercial real estate loan portfolio is performing with no defaults.  The broader real estate recovery has

34

taken hold and we remain optimistic about fundamentals, but are cautiously on the lookout for markets that we feel are outpacing normal sustainable growth. The positive performance of our portfolio is a daily reminder that validates the credit first approach to lending and selectivity we apply to markets, asset classes and sponsors in our origination process.

We ended the period with $4 million in commercial real estate allowances and $3.2 million in commercial financial allowances.  With the lone exception of the one specific middle market position that became impaired, our credit has been very good.  One bank loan where a mere $251,000 is delinquent out of a portfolio of $298 million.  All of our middle market loans are current, and as Dave Bloom mentioned, all 79 of our real estate loans totaling $1.5 billion are current.

82.    On May 11, 2015, the Individual Defendants caused Resource Capital to file with the SEC its Form 10-Q for the quarter ended March 31, 2015.  The Form 10-Q concealed the Company's exposure to the Puerto Rican economic crisis misrepresented the geographic distribution of the portfolio as limited to the mainland United States and misrepresented the risk level of Resource Capital's commercial real estate loans portfolio by stating that "[a]ll of the Company's commercial real estate loans were performing as of September 30, 2014 and December 31, 2013."  The Form 10-Q also disclosed:

**Commercial Real Estate Loans**

The Company uses a risk grading matrix to assign grades to commercial real estate loans.  Loans are graded at inception and updates to assigned grades are made continually as new information is received.  Loans are graded on a scale of 1-4 with 1 representing the Company's highest rating and 4 representing its lowest rating.  The Company also designates loans that are sold after the period end at the lower of their fair market value or cost, net of any allowances and costs associated with the loan sales. In addition to the underlying performance of the loan collateral, the Company considers metrics such as the strength of underlying sponsorship, payment history, collectability of interest, structural credit enhancements, market trends and loan terms in grading its commercial real estate loans.

Credit risk profiles of commercial real estate loans were as follows (in thousands):

#2915089v.1

| | Rating 1 | | Rating 2 | | Rating 3 | | Rating 4 | | Held for Sale | | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **As of March 31, 2015** | | | | | | | | | | | |
| Whole loans | $ | 1,329,882 | $ | 32,500 | $ | — | $ | — | $ | — | $ | 1,362,382 |
| B notes | | 16,031 | | — | | — | | — | | — | | 16,031 |
| Mezzanine loans | | 45,417 | | 22,054 | | — | | — | | — | | 67,471 |
| | $ | 1,391,330 | $ | 54,554 | $ | — | $ | — | $ | — | $ | 1,445,884 |
| | | | | | | | | | | | |
| **As of December 31, 2014:** | | | | | | | | | | | |
| Whole loans | $ | 1,231,092 | $ | 32,500 | $ | — | $ | — | $ | — | $ | 1,263,592 |
| B notes | | 16,072 | | — | | — | | — | | — | | 16,072 |
| Mezzanine loans | | 45,432 | | 21,934 | | — | | — | | — | | 67,366 |
| | $ | 1,292,596 | $ | 54,434 | $ | — | $ | — | $ | — | $ | 1,347,030 |

All of the Company's commercial real estate loans were current as of March 31, 2015 and December 31, 2014.

83.     In the Form 10-Q, the Individual Defendants also falsely stated that there were no mezzanine loans included in the category of "troubled-debt restructurings" as of March 31, 2015:

**Troubled-Debt Restructurings**

The following tables show troubled-debt restructurings in the Company's loan portfolio (in thousands):

| | Number of Loans | Pre-Modification Outstanding Recorded Balance | | Post-Modification Outstanding Recorded Balance | |
|---|---|---|---|---|---|
| **Three Months Ended March 31, 2015:** | | | | | |
| Whole loans | 2 | $ | 67,459 | $ | 67,459 |
| B notes | — | | — | | — |
| Mezzanine loans | — | | — | | — |
| Bank loans | — | | — | | — |
| Middle market loans | — | | — | | — |
| Residential mortgage loans | — | | — | | — |
| Loans receivable - related party | — | | — | | — |
| Total loans | 2 | $ | 67,459 | $ | 67,459 |

The Company had no troubled-debt restructurings during the three months ended March 31, 2014.  As of March 31, 2015 and 2014, there were no commercial real estate loan troubled-debt restructurings that subsequently defaulted.

### The Truth Begins to Emerge

84.     On August 4, 2015, the Individual Defendants caused Resource Capital to issue a press release announcing its results for the quarter ended June 30, 2015.  In the press release, the Individual Defendants disclosed that the Company had sustained a GAAP net loss of $31 million

36

for the quarter due to due to its recording of an allowance of $41.1 million for the Mezzanine Loan.  As reported in the press release:

> *Impairment*
>
> During the quarter ended June 30, 2015, the Company recorded a substantial allowance for loan loss on a subordinated mezzanine loan position that was acquired in 2007.  The outstanding loan balance of $38.1 million was fully reserved, and associated accrued interest of $3.0 million was reversed against interest income, for a total charge to operations of $41.1 million.  The loan was originally supported by a portfolio of 13 hotel properties, most of which were luxury brand hotels.  The last three luxury brand hotel properties securing the loan are located in or near San Juan, Puerto Rico, and recent economic and credit disruptions in Puerto Rico resulted in events that caused the Company to determine that the loan should be fully reserved.

85.    On August 5, 2015, the Individual Defendants caused Resource Capital to conduct a conference call to discuss the results issued the previous day.  During the call, defendant J. Cohen stated:

> [W]e cannot ignore the significant pressure on our stock price which has certainly been a source of frustration for our shareholders and for us personally.
>
> On top of that a legacy mezzanine loan that we purchased in 2007, one of the last two mezzanine positions in our portfolio deteriorated suddenly due to its exposure to Puerto Rico and we were forced to impair that asset.  We stopped investing in this type of loan in 2007 and the remaining mezzanine loan in our portfolio is a very good credit, a $7 million position secured by property in New York City and we expect it to pay off within the next 18 months.  This impairment causes our book value to decrease to $4.56 leaving us trading at approximately 78% of GAAP book value.
>
> *  *  *
>
> Obviously a large and very disappointing element of our result this quarter was the loan loss reserve that we recognize on our position in a mezzanine loan whose borrower is an affiliate of one of the world's largest private equity firms.  The loan we impair was one where we had a small percentage of a subordinated mezzanine position in a complicated multi-tranche $2.8 billion transaction that financed luxury hotels.
>
> Our investment was purchased in 2007 [and] a very well capitalized and committed borrower went through several restructurings over the years to provide

37

runway for the borrower to complete its business plan and we expected to be paid off when that happens.

But the last three assets are in Puerto Rico.  The borrower's ability to favorably refinance its senior loans was impacted by economic and credit conditions in Puerto Rico and the new loan which closed in May meaningfully reduced the borrower's time to achieve its plan. On such [a] highly leveraged transaction even small changes in value can have a large impact on the subordinated tranches which unfortunately is where we were.

Accordingly, we have fully reserved for it.

86.     Also during the call, defendant Bloom added:

Jonathan addressed the specific reserve that we took this quarter on a mezzanine loan that was part of a very large multi-tranche financing that included a $ 1.3 billion first mortgage and $625 million of mezzanine debt split into eight tranches, many with multiple participants and over $830 million of borrower equity into the transaction.  Its important note that this loan dates back to mid-2007 and was restructured and amended in 2012 and since that time, interest was on an accrual basis so it has not contributed to our income since September of 2012 in any meaningful way.

Pursuant to the terms of the extension the loan has not some due, nor is it in default, that said in the ordinary course of closing our quarters we review all of our loan positions and after a review of the subject transaction the determination was made to impair the position in the current quarter as we have serious doubts about the ultimate collectability of the loan upon maturity.  That said, markets can change suddenly and with almost a year until the loan matures, no one can be absolutely certain about the ultimate resolution of this impaired loan.

By way of brief history RSO's commercial real estate business plan has always been to directly originate, floating rate whole loans unlikely transitional properties across the country.  Having commenced operations in mid-2005 during the time that we were building out our national origination team, we still recognized relative value in certain mezzanine loans and B note investments.  Markets were extremely liquid and the majority of these subject positions paid off in relatively short order, that said we were always cognizant of the fact that multi-tranche debt transactions involved other lenders which results in a lack of unilateral control should a problem arise.

87.     On August 7, 2015, the Individual Defendants caused Resource Capital to file with the SEC its Form 10-Q for the quarter ended June 30, 2015.  The Form 10-Q finally

38

disclosed: (i) the Company's exposure to the Puerto Rican economic crisis; and (ii) the extent of

the credit risk to the Company's mezzanine loan portfolio.  The Form 10-Q disclosed:

> During the quarter ended June 30, 2015, the Company recorded an allowance for loan loss on a subordinated mezzanine loan position that was acquired in 2007. The outstanding loan balance of $38.1 million was fully reserved and associated accrued interest of $3.0 million was reversed against interest income, for a total charge to operations of $41.1 million.  The loan was originally supported by a portfolio of 13 hotel properties, most of which were luxury brand hotels.  An impairment analysis showed that the fair value of the underlying collateral declined from that as of March 31, 2015. Contributing to this decline was a modification of the senior mortgage that accelerated the time horizon for disposing of the three remaining properties collateralizing the loan. Compounding this fact, the remaining three luxury brand hotel properties securing the loan arc located in or near San Juan,

> Puerto Rico, and recent economic and credit disruptions in Puerto Rico resulted in events that caused the Company to determine that realizable values had declined rapidly and that the troubled debt restructuring should be fully reserved as of June 30, 2015.

> Credit risk profiles of commercial real estate loans were as follows (in thousands):

| | Rating 1 | Rating 2 | Rating 3 | Rating 4 | Held for Sale | Total |
|---|---|---|---|---|---|---|
| **As of June 30, 2015** | | | | | | |
| Whole loans | $1,467,901 | $ 32,500 | $  — | $ 2,202 | $  — | $1,502,603 |
| B notes | 15,997 | — | — | — | — | 15,997 |
| Mezzanine loans | 16,750 | — | — | 38,072 | — | 54,822 |
| | $1,500,648 | $ 32,500 | $  — | $ 40,274 | $  — | $1,573,422 |
| | | | | | | |
| **As of December 31, 2014:** | | | | | | |
| Whole loans | $1,231,092 | $ 32,500 | $  — | $  — | $  — | $1,263,592 |
| B notes | 16,072 | — | — | — | — | 16,072 |
| Mezzanine loans | 45,432 | 21,934 | — | — | — | 67,366 |
| | $1,292,596 | $ 54,434 | $  — | $  — | $  — | $1,347,030 |

> The Company had no delinquent commercial real estate loans as of June 30, 2015 and December 31, 2014.

88.     In contrast to their previous disclosures, the Individual Defendants now disclosed

that $38 million in mezzanine loans had a risk rating of 4 and that the Company's allowance for

loan loss had increased to $46.3 million, compared with $7.3 million during the previous quarter.

39

89.     On February 12, 2016, the Amended Complaint was filed in the Securities Class Action against the Company and defendants J. Cohen, Bryant, Blackwell, and Bloom.

90.     On May 20, 2016, J. Cohen and E. Cohen resigned as directors of Resource Capital effective September 8, 2016.   The Board appointed Jeffrey Cohen (no relation) and Andrew L. Farkas as replacement directors on May 21, 2016.

91.     On May 23, 2016, Resource America announced it would be acquired by C-III

92.     Defendant J. Cohen resigned as CEO and President effective September 8, 2016, and Robert C. Lieber was appointed as CEO and President.

93.     On October 5, 2016, the Judge Stanton denied the defendants' motion to dismiss the Securities Class Action, stating:

> To describe the Mezzanine Loan as "performing" or "current" without stating the qualification that it was a non-interest-paying troubled debt of a borrower in financial difficulty was, in the words of SEC Rule 10b-5 ". . . to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading . . . ." That pleads a prima facie violation of § 10(b) of the Exchange Act, 15 U.S.C. § 78j(b).
>
> Defendants raise issues, but each is rebuttable (in parentheses).   They say the omission was not material in comparison to Resource's overall assets (it was material to the truth of the statements they made in the 10-Qs, and the stock fell 12% on the announcement of the need for 100% reserve against the debt). Defendants argue that they lacked scienter (the relevant facts were well known to them, and the omission gave Resource Capital the advantage of maintaining the impression that all was well in the portfolio).   They assert that the non-disclosure accorded with Generally Accepted Accounting Principles (the Financial Accounting Standards Board does not grant exemptions from making disclosures required to avoid misleading under the Exchange Act).

94.     The parties in the Securities Class Action are currently briefing plaintiff's motion for class certification.

## DAMAGES TO THE COMPANY

95.     Resource Capital has been, and will continue to be, severely damaged and injured by the Individual Defendants' misconduct.  As a direct and proximate result of the Individual Defendants' conduct, Resource Capital has been seriously harmed and will continue to be.  Such harm includes, but is not limited to:

     a.   Legal costs incurred and to be incurred due to the wrongdoing alleged herein and defending the Company and defendants against a wide variety of civil investigations and lawsuits;

     b.   Likely civil liability in the Securities Class Action;

     c.   Significant loss of market capital; and

     d.   Funds paid to the Individual Defendants and the Manager while they were breaching their fiduciary duties and/or on the basis of artificially inflated results.

96.      In addition, Resource Capital's business, goodwill, and reputation with its business partners, regulators, and shareholders have been gravely impaired.  The Company has still not held defendants accountable for their intentional illegal acts.  As a result, the credibility and motives of management are in serious doubt, even after the hiring of a new CEO and the addition of new directors to the Board

97.     The actions complained of herein have irreparably damaged Resource Capital's corporate image and goodwill.  For at least the foreseeable future, Resource Capital will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that Resource Capital's ability to raise equity capital or debt on favorable terms has already been impaired and will be in the future.

41

## DERIVATIVE AND DEMAND ALLEGATIONS

98.     Plaintiff brings this action derivatively in the right and for the benefit of Resource Capital to redress injuries suffered by Resource Capital as a direct result of the breaches of fiduciary duty by the Individual Defendants detailed herein.   Resource Capital is named as a nominal defendant solely in a derivative capacity.   This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

99.     Plaintiff will adequately and fairly represent the interests of Resource Capital in enforcing and prosecuting its rights.

100.     Plaintiff was a shareholder of Resource Capital at the time of the wrongdoing complained of, has continuously been a shareholder since that time, and is a current Resource Capital shareholder.

101.     Plaintiff made a demand on the Board to investigate and remedy the violations of law described herein as required by Maryland law.   When the Board rejected the Demand it was not fully informed and was not acting independently.   Accordingly, the Board's refusal of the Demand was not a protected exercise of business judgment.

102.     On February 10, 2017, plaintiff sent the Demand to the Board.   The Demand states plaintiff owns 400 shares of Resource Capital and has owned those shares since prior to disclosure of the wrongdoing alleged herein.   Attached to the Demand was documentary proof of such ownership.   The Demand raises the wrongdoing described above and requests the Board investigate whether these intentional wrongs were breaches of fiduciary duties or otherwise violated applicable law.

103.     The Demand asks the Board to "take action, which would include, among other things, the institution of an action for breach of fiduciary duty against any and all persons or

entities who are responsible for the harm incurred by the Company." A true and correct copy of the Demand is attached hereto as Exhibit A.

104.    On February 24, 2017, plaintiff received a letter from Shelle Weisbaum, Resource Capital's Chief Legal Officer, stating that the Company was "reviewing this matter," and that Ms. Weisbaum would "communicate further regarding this matter in due course." Plaintiff replied to Ms. Weisbaum on February 27, 2017, seeking additional information about the Board's "review."

105.    In a letter dated March 10, 2017, outside counsel to the Company, Fox Rothschild LLP ("Fox Rothschild"), forwarded plaintiff the response of the Board to a similar shareholder demand.

106.    Thereafter, plaintiff received a letter dated April 20, 2017 from counsel to the DEC, the Law Office of Michael LiPuma, stating that the DEC was "close to finishing its investigation," but that before it did so, it was offering plaintiff the opportunity to meet with the Committee in person or submit additional materials in writing.

107.    Plaintiff expressed a desire to meet with the DEC, and, on May 25, 2017, plaintiff's counsel met with DEC member-defendants Levin and Ickowicz in Philadelphia, Pennsylvania. Defendant Fore was not present. During the meeting, plaintiff's counsel stated that the DEC's responses to other shareholder demands did not address claims raised by plaintiff's demand. Specifically, previously issued demand refusals had not investigated whether: (a) the misleading disclosures issued above were breaches of fiduciary duties; and (b) whether compensation was wrongfully paid to insiders who were breaching their fiduciary duties.

43

108.     Plaintiff's counsel told the DEC that the Committee's determination of its own independence was problematic because each committee member was ostensibly a target of the investigation due to the fact that Levin and Ickowicz had signed the misleading Forms 10-K for the years 2012 through 2014, and that Fore had signed the Form 10-K for 2013 and 2014. Plaintiff's counsel observed that it was unknown whether the DEC had considered these potential conflicts, what the consideration included, and, if it had, on what basis the DEC had concluded that its members could independently investigate whether they had breached their own fiduciary duties.

109.     During the meeting, plaintiff's counsel also observed that the demand refusals given to other shareholders described the DEC's investigation as restricted in scope to matters concerning the adequacy of internal controls and the timing of the decision to write off the mezzanine loan.  As such, the DEC had not investigated the disclosure and compensation claims raised by plaintiff's demand, or whether the disclosures led to the inflation of compensation paid to the Manager and/or insiders.

110.     Plaintiff's counsel specifically pointed out that had the DEC investigated whether issuance of the misleading disclosures was a breach of fiduciary duties, the merit in such claims would have been apparent in light of denial of the motion to dismiss in the Securities Class Action.  Plaintiff's counsel notified the DEC that claims withstanding a motion to dismiss on the fraud pleading standard applicable to the Securities Class Action could not be dismissed as lacking merit without an explanation of the DEC's reasoning.  Plaintiff's counsel also solicited the DEC to provide its reasoning and conclusions regarding the payment of incentive compensation to individuals or the Manager while they were issuing misleading financial disclosures.

44

111.    Plaintiff's counsel concluded by requesting that the DEC conduct an investigation of the disclosure and compensation claims in plaintiff's demand, disclose the basis of its independence and merits determinations, and proposed that the DEC could demonstrate good faith by obtaining tolling agreements with defendants in the Securities Class Action.

112.    By letter dated June 29, 2017, the DEC refused plaintiff's demand (the "Refusal").  A true and correct copy of the Refusal is attached hereto as Exhibit B.

113.    The Refusal confirms that the entire conflicted Board voted to refuse plaintiff's Demand.  Ex. B at 1.  The Refusal Board consisted of defendants Beach, J. Cohen, Hart, Ickowicz, Kessler, Levin, Neff, Wiggins, and a non-defendant post-wrongdoing director, Henry R. Silverman.  With the exception of Mr. Silverman, each of these directors is a potential defendant in a breach of fiduciary duty action and signed the misleading Forms 10-K.  Notably, the presence of Mr. Silverman on the Board is an obvious choice to convene an ostensibly disinterested Special Litigation Committee to independently respond to the Demand, but the Board failed to take steps to cleanse the apparent conflict.

114.    The Refusal states the DEC members determined they could disinterestedly investigate the claims, presumably including their own conduct.  However, the Refusal provides no reasoning to support the conclusion and provides no detail regarding the DEC's consideration of this matter.  Because the Refusal does not refer to any evaluation of Board independence, plaintiff infers that none was conducted.

115.    While the DEC arguably retained independent counsel, correspondence related to Refusal makes clear that the Board's decision was advised by Fox Rothschild, counsel to the Company.  Fox Rothschild was conflicted because it was representing the Company and also advising individuals against whom the Company has potential claims.

45

116.    The Refusal admits that the DEC had not previously investigated whether the Company's public statements to the effect that all of its loans were performing and other misleading statements in public filings implicated breaches of fiduciary duties.  Ex. B at 4-5.

117.    In the Refusal, the DEC failed to properly identify the claims at issue with respect to the Demand's allegation that the Manager had been excessively compensated while the Company's results were being falsely reported.  Ex. B at 6-8.  Specifically, the DEC apparently only evaluated disclosures related to the Manager's compensation.  The Refusal is devoid of any evidence that the DEC considered whether Management fees ought to be, or could be, clawed back due to the wrongdoing on the Manager's watch.  *Id.* at 8.

118.    The DEC's report fails to document the DEC's reasoning and conclusions regarding major issues.   With respect to the Company's public disclosures alleged to be misleading in the Securities Class Action, the DEC stunningly concluded that the Company's "statements, that all of its loans were performing, were not misleading."  Ex. B at 5, 6.  The Refusal fails to explain the reasoning by which the DEC determined that there was no merit to breach of fiduciary duty claims arising out of those disclosures when Judge Stanton had already concluded that a claim for securities fraud was stated as to the those same disclosures.  It is evident from this conclusion that the DEC did not properly identify the claims at issue: settled Maryland law holds that acts of deliberate dishonesty are non-exculpable breaches of fiduciary duty.  *Id.* at 10-13.  Accordingly, a proper application of relevant legal standards could not reach the conclusion that claims for non-exculpable breaches of fiduciary duties against some insiders lacked any merit.

119.    Attempting to support its facially incorrect conclusion that the Demand's "claims lack *any* factual or legal merit," (emphasis added) the Refusal reveals the DEC's lack of

46

independence and failure to exercise valid business judgment in responding to the Demand.  The Refusal states that "the DEC finds that none of the directors and officers made any material misrepresentations or omissions in the company's 10-K and 10-Q filings, in its Proxy Statements, or in the company's other public statements." Ex. B at 18.  The Refusal concludes that "[b]ased on its investigation, as discussed above, the DEC has concluded that those public statements were not misleading." *Id*.  This conclusion is based on no more than the DEC's disagreement with Judge Stanton's ruling.  However, in light of the holding that the very facts at issue in the Demand state a claim for securities fraud, the DEC's conclusion was not a valid exercise of business judgment.

120.    The Refusal demonstrates the DEC simply concluded its process after reaching the clearly indefensible conclusion that the claims lacked "any" merit.  Accordingly, the DEC did not actually evaluate chances for a recovery, potential amounts recoverable, or evaluate the costs of pursuing claims against insiders named in the Securities Class Action compared to the Company's likely financial exposure in the Securities Class Action.

121.    No legal action has been filed by Resource Capital against any of the Individual Defendants.  The primary architects of the accounting fraud and other wrongdoing detailed herein have been allowed to resign and retire, rather than being terminated for cause. Accordingly, plaintiff's institution of this action is necessary to preserve the claims asserted herein for the benefit of the Company.

122.    Plaintiff has not made any demand on the other shareholders of ARCP to institute this action since such demand would be a futile and useless act for at least the following reasons:

a.       Resource Capital is a publicly held company with over  millions of shares outstanding and at least thousands of shareholders;

b.      Making a demand on such a number of shareholders would be impossible for plaintiff who has no way of determining the names, addresses, or phone numbers of the other shareholders; and

c.      Making a demand on all shareholders would force plaintiff to incur excessive expenses, assuming all shareholders could be individually identified.

## COUNT I
## BREACH OF FIDUCIARY DUTY AS TO ALL DEFENDANTS

123.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

124.    Defendants owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Resource Capital's business and affairs.  They were duty-bound to act in good faith in a manner they reasonably believed to be in the best interests of the Company with the care that an ordinarily prudent person in a like position would use under similar circumstances.

125.    Defendants' conduct set forth herein breached that duty.   In so doing, the defendants acted with active and deliberate dishonesty by repeatedly issuing public disclosures that misrepresented Resource Capital's financial condition and omitted to disclosure its exposure due to the Mezzanine Loan.

126.    Defendants received improper benefits as a result of their breaches of fiduciary duty in the form of incentive and other compensation paid due to artificially inflated results and/or due to positions retained only because the truth of Resource Capital's condition was concealed from investors.

127.    Through the foregoing, defendants caused the Company to expend unnecessarily its corporate funds and failed to act in good faith in their role overseeing Resource Capital's

business, rendering them personally liable to the Company for breaching their fiduciary duties.

128.    As a direct and proximate result of the defendants' breaches of their fiduciary obligations, Resource Capital has sustained and continues to sustain significant damages.  As a result the defendants are liable to the Company.

## PRAYER FOR RELIEF

FOR THE FOREGOING REASONS, plaintiff demands judgment in the Company's favor against all defendants as follows:

A.    Declaring that plaintiff may maintain this action on behalf of Resource Capital and that plaintiff is an adequate representative of the Company;

B.    Declaring that the defendants have breached their fiduciary duties to Resource Capital;

C.    Determining and awarding to Resource Capital the damages sustained by it as a result of the violations set forth above by each of the defendants, jointly and severally, together with interest thereon;

D.    Directing Resource Capital and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Resource Capital and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's By-Laws or Articles of Incorporation; and the following actions as may be necessary to ensure proper Corporate Governance Policies:

1.    a proposal to strengthen the Board's supervision of Resource Capital's operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

49

2.      a provision to permit the shareholders of Resource Capital to nominate at least three candidates for election to the Board; and

3.      a proposal to ensure the establishment of effective oversight of Resource Capital's compliance with applicable laws, rules, and regulations;

E.      Determining and awarding to Resource Capital exemplary damages in an amount necessary to punish defendants and to make an example of defendants to the community according to proof at trial;

F.      Awarding Resource Capital restitution from defendants, and each of them;

G.      Awarding plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

H.      Granting such other and further equitable relief as this Court may deem just and proper.

### JURY DEMAND

Pursuant to Fed. R. Civ. P. 38(b), Plaintiff demands a trial by jury.

Dated: September 7, 2017          **TYDINGS & ROSENBERG LLP**

/s/ John B. Isbister
John B. Isbister, Federal Bar No. 00639
Daniel S. Katz, Federal Bar No. 01148
One East Pratt Street, Suite 901
Baltimore, Maryland 21202
(410) 752-9700

OF COUNSEL FOR PLAINTIFF:

Robert I. Harwood
Matthew M. Houston
Benjamin I. Sachs-Michaels
HARWOOD FEFFER LLP
488 Madison Avenue
New York, NY 10022
(212) 935-7400

50